## BLENDA LIFE CORP. v. BLENDA LIFE, INC.

196 N. W. 2d 925.

April 21, 1972—No. 42807.

*Raphael J. Miller,* for appellant.
*Arthur E. Anderson* and *George T. Havel,* for respondent.

PER CURIAM.

Plaintiff, Blenda Life Corp., an Illinois corporation (hereafter, "Corp."), was granted judgment in its action against Blenda Life, Inc.,

a Minnesota corporation (hereafter, "Inc."), for the recovery of money due on notes and under a royalty agreement. The only issues in the appeal arise out of defendant's counterclaim for fraud in a so-called "spin-off" transaction and the denial of defendant's motion to withdraw its waiver of trial by jury.

An abbreviated statement of events leading to the spin-off will suffice because claims of fraud arising out of these prior events have been abandoned on appeal. Arthur R. White developed a secret formula for the production of unique animal feeds, and organized a corporation, now known as Blenda Life, Inc., for the production and sale of these feeds. Defendant Inc. began to experience serious financial difficulties in 1953. One R. S. Stevens, who had used Inc.'s products on his farm in Illinois, learned of Inc.'s financial difficulties, and thereafter represented to White that he and some of his associates might agree to form a corporation, adequately capitalized, to acquire all the Inc. stock and provide necessary financial and managerial assistance. Agreement having been reached among Stevens, White, and the other shareholders of Inc., Stevens organized Blenda Life Corp.

Pursuant to the agreement, Corp. was initiated with a capital investment of approximately $51,000. Stevens and his associates received 51,104 shares ($1 par value) of Corp. stock. All of the Inc. shareholders, including White, assigned their Inc. shares, valued at approximately $49,000, to Corp., and in return received 48,896 shares ($1 par value) of Corp. stock. White, who owned the secret formula as an individual, at the same time transferred ownership of the formula to Corp., and in return received a guaranteed income based upon the tonnage of feed sold, a contract of employment with Inc. with an annual salary of $8,500, and an option to purchase, within 5 years, 25,000 shares of Corp. stock at $1 per share. Stevens received a contract of employment with an annual salary of $20,000 and an option to purchase, within 5 years, 100,000 shares of Corp. stock at $1 per share.

Stevens was in complete control of Corp. under a voting trust agreement, and the corporate affairs prospered. He had Corp. advance operating money to Inc. by purchasing Inc.'s customer paper. He caused Corp. to invest $48,000 in the purchase of all the stock of McHenry Mills, an Illinois corporation, and to use McHenry's facilities exclusively for the manufacture of Blenda Life feeds, shipping them directly to Inc.'s customers, with the customers paying Inc. and Inc. paying McHenry part of the amount received. McHenry later purchased, for $12,000, all the stock of Perfection Foods, Inc., of Battle Creek, Michigan, using its plant for the manufacture of Blenda Life feeds. McHenry subsequently sold Perfection Foods to Inc. for about $24,000. Inc. from

1956 on paid dividends to Corp. and Corp. in turn paid these to the shareholders.

Corp. redeemed one-half of all outstanding shares of Inc. in 1958 at $1 per share, leaving each shareholder with half as many shares but the same proportionate ownership as before. In the same year, Stevens, pursuant to his option, purchased 50,000 shares of Corp. stock at $1 per share, and White bought 12,500 shares at $1 per share.

Sometime in 1962 White indicated that he would like to resume control of Inc., and Stevens indicated that he would like to withdraw from active participation in Inc.'s affairs. White could not raise enough money to buy the Inc. stock, so Stevens suggested the idea of a "spin-off," which was approved by holders of over 99 percent of the shares. Stevens represented to the shareholders of Corp. that the book value of the two corporations would be substantially equal after the spin-off. This was the basic idea behind the spin-off: To equalize the net book value of Corp. and Inc. by taking some of Inc.'s assets out in the form of a dividend to Corp., the sole shareholder, and then to give each shareholder in Corp. a proportionate number of Inc. shares. Stevens and White agreed that, following the spin-off, Stevens would buy all of White's shares in Corp. and White would buy most of Stevens' shares in Inc., thereby giving White control of Inc. These, in more detail, were the steps in the spin-off:

(a) Stevens received a 5-year consulting contract with Inc. at $7,500 per year, later canceled after 3 years in exchange for 2 years' compensation.

(b) Corp. retained ownership of the secret formula but made the formula available to Inc. on a royalty basis under written agreement.

(c) Inc. paid Corp. a dividend of $44,347 in customer notes in order to equalize the book values of the two corporations.

(d) Corp. agreed to furnish Inc. with an outlet for customer notes on a discount basis with recourse.

(e) Inc. acquired ownership of Perfection Foods from McHenry Mills by purchasing all the Perfection stock for approximately $24,000. Since Perfection owed McHenry $43,000 and Corp. $8,000, Inc. paid off these debts. In all, Inc. spent approximately $70,000 to acquire Perfection Foods. Corp. purchased $70,000 worth of Inc.'s customer paper so that Inc. could complete this transaction.

(f) Corp. retained ownership of McHenry Mills. Corp. liquidated it by dissolving McHenry Mills and shifted its assets of nearly $53,000 into Corp.

(g) In order to reap certain tax advantages from the spin-off, Corp.

had to continue carrying on some business activity after the spin-off, so it purchased Kelly Plastics in 1963 for $24,000.

1. We hold that defendant Inc.'s counterclaim was, for several reasons, properly denied. It must be noted, first, that the counterclaim arises in an action by Inc., the subsidiary, against Corp., the parent. We think the subsidiary is without standing to challenge the acts of its parent. That, alone, is dispositive. Second, although this is not an action by White and his fellow shareholders against either Corp. or Stevens, the basic claim is that Stevens, the dominant shareholder of plaintiff Corp., had falsely represented to the Corp. shareholders that the post-spin-off book value of the two corporations would be substantially equal. The findings adverse to that contention are not without evidentiary support. The simple fact emerging from the complex transaction appears to be that the proportionate dollar interest of the shareholders in Corp. and Inc. did remain the same following the spin-off, so that they could not have sustained damage. Third, in so far as there may be a controversy between White and Stevens, arising out of the relationship between them as individuals, neither is a party to this action.

2. The trial court did not abuse its discretion in denying Inc.'s motion for a jury trial. It is undisputed that Inc. had at one point affirmatively waived its right to a jury trial. A determination of whether or not to grant a motion to withdraw such waiver in favor of the right to a jury trial is, in a civil case, addressed to the sound discretion of the court. Having in mind the complex nature of the issues to be presented, we conclude that there was no abuse of judicial discretion.

Affirmed.

MR. JUSTICE TODD, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.